UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
BRENDA MARCH,

                              Plaintiff,

              -against-

FIRST CHOICE MEDICAL PLLC and LISA
COHEN and DR. LAWRENCE GOLDMAN, MD.,
*individually and in their official capacities and as
aider and abettor*,

                              Defendants.
-----------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND
ORDER TO SHOW CAUSE**

Plaintiff Brenda March brings this action against First Choice Medical PLLC ("First

Choice"), Lisa Cohen, and Dr. Lawrence Goldman, MD., alleging age discrimination in violation

of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*., the

New York State Human Rights Law ("NYSHRL"), New York Executive Law § 292 *et seq.*, and

the Suffolk County Human Rights Law ("SCHRL"), Suffolk County Code § 528-7 *et seq*.

(Compl. (Doc. No. 1).)  Defendants now move for summary judgment pursuant TO FED. R. CIV.

P. 56.  For the reasons set forth below, defendants' motion is granted with respect to the ADEA

claim and the parties are directed to show cause in writing why this Court should not dismiss the

remaining state claims without prejudice to bringing them in state court.

## BACKGROUND

Factual Background

Unless otherwise noted, the following facts are not in dispute.  First Choice is a medical

office owned by Dr. Lawrence Goldman.  (Defendants' Rule 56.1 Statement of Undisputed

Material Facts ("Defs.' 56.1") (Doc. No. 63) ¶ 1; Plaintiff's Rule 56.1 Counterstatement of

Material Facts ("Pl's 56.1") (Doc. No. 72) ¶ 1.)[1]  Goldman is a medical doctor who specializes in internal medicine.  (Defs.' 56.1 ¶ 2; Pl.'s 56.1 ¶ 2.)  Goldman "originally bought into First Choice in or around 1966," when the practice had only one office, located in Holbrook, New York (the "Holbrook office").  (Defs.' 56.1 ¶ 3; Pl.'s 56.1 ¶ 3.)  In 1997, First Choice opened a second office in Eastport, New York (the "Eastport office").  (Defs.' 56.1 ¶ 4; Pl's 56.1 ¶ 4.)  In 2001, Goldman bought out the other partners of First Choice and became the sole owner of the practice.  (Defs.' 56.1 ¶ 5; Pl.'s 56.1 ¶ 5.)  In or about 2002, First Choice opened a third office, located in Riverhead, New York (the "Riverhead office"); this office closed in late 2012.  (Defs.' 56.1 ¶¶ 6–7; Pl.'s 56.1 ¶¶ 6–7.)  In December 2017, the Eastport office was purchased by another doctor's practice, leaving First Choice with only one location, in Holbrook.  (Defs.' 56.1 ¶¶ 8–9; Pl.'s 56.1 ¶¶ 8–9.)

When there were multiple First Choice offices, the staff at each office would report to their office's Office Manager, who reported directly to Goldman.  (Defs.' 56.1 ¶ 10; Pl.'s 56.1 ¶ 10.)  From around 2003 until the office was sold in December 2017, Lisa Cohen worked as the Office Manager of the Eastport office and reported directly to Goldman.  (Def.' 56.1 ¶¶ 12–13; Pl.'s 56.1 ¶¶ 12–13.)  Cohen began working at First Choice in 2001 as a biller.  (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.)  As Office Manager, Cohen was responsible for "running the office"; her duties included supervising office staff, the front desk staff, and the medical assistants, as well as assisting with medical billing, "patients, and the front desk."  (Defs.' 56.1 ¶ 14; Pl.'s 56.1 ¶ 14.)  At her deposition, Cohen affirmed that she had a "role in disciplining employees" and the authority to fire them, and stated that "if an employee needs to be disciplined I have another staff

---

[1] March's 56.1 statement restarts the paragraph numbering on page 41, under the heading "Plaintiff's Additional Undisputed Facts."  For ease of reference, the Court will refer to the first set of numbered paragraphs as, e.g., "¶ 1," and the repeated numbers as, e.g., "second ¶ 1."  Unless otherwise noted, all page numbers refer to ECF pagination.

member come in a room and we verbally talk to them. They get two verbal warnings and then they get a write up." (Exhibit 2 to Affidavit/Declaration in Opposition, Deposition Transcripts ("Exhibit 2") (Doc. No. 73-2) at 6.) In a supplemental affidavit, Cohen asserts that she had been describing the disciplinary policy at the time she was deposed, but that during the period when March was employed with First Choice, there was no formal disciplinary policy in place. (Cohen Supplemental Affidavit (Doc. No. 78) ¶ 5.)

From 2003 until its closure in late 2012, Adeline Fontana worked as the Office Manager of the Riverhead office. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15.) Fontana was initially hired in 1992 as a front desk receptionist at the Holbrook office. (*Id.*)

Brenda March is a licensed x-ray technician and certified medical assistant who first began working at First Choice in November 2003. (Defs.' 56.1 ¶¶ 17–18; Pl.'s 56.1 ¶¶ 17–18.) Cohen interviewed March at the Eastport office and then recommended to Goldman that March be hired to work at First Choice. (Defs.' 56.1 ¶¶ 19, 21; Pl.'s 56.1 ¶¶ 19, 21.) At the time of her interview, Cohen did not know precisely how old March was, but believed she was in her 50s; March was 54 years old. (Defs.' 56.1 ¶¶ 20, 22; Pl.'s 56.1 ¶¶ 20, 22.)

Following her hiring, March typically worked about two days per week at the Eastport office and two or three days per week at the Riverhead office. (Defs.' 56.1 ¶ 24; Pl.'s 56.1 ¶ 24.) Cohen supervised March when she worked at the Eastport office and Fontana supervised March when she worked at the Riverhead office. (Defs.' 56.1 ¶ 25; Pl.'s 56.1 ¶ 25.) In 2009, the Eastport office moved to a new office space, which lacked the equipment to do x-rays. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.)

<u>March's Promotion to Floor Manager</u>

In or about 2011, March was promoted to Floor Manager at the Riverhead office. (Defs.' 56.1 ¶ 26; Pl.'s 56.1 ¶ 26.) After she received the promotion to Floor Manager, March's compensation increased from $26 per hour to $30 per hour. (Defs.' 56.1 ¶ 27; Pl.'s 56.1 ¶ 27.) At the time of the promotion, March was 62 years old. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) The Floor Manager is responsible for organizing exam rooms and keeping them stocked with equipment and supplies, ordering inventory, training staff, handling prior authorization requests to medical insurers, keeping track of lab work and ensuring lab results are sent to the appropriate providers, promptly completing "callbacks" to provide lab results to patients, "bringing patients in," checking vital signs, and "doing other tests that need to be completed." (Defs.' 56.1 ¶¶ 30, 33–36; Pl.'s 56.1 ¶¶ 30, 33–36.) As Floor Manager, March was also responsible for supervising all of the medical assistants and "overseeing 'the floor,' which includes the exam rooms, the tests being ordered for the patients, phlebotomy, EKGs, and other exams." (Defs.' 56.1 ¶¶ 31–32; Pl.'s 56.1 ¶¶ 31–32.) March was also responsible for reviewing patients' charts at the beginning of each workday to ensure that "all of the documentation was filled out properly" and for ensuring that "red charts" were being processed properly and in a timely manner. (Defs.' 56.1 ¶¶ 37, 39; Pl.'s 56.1 ¶¶ 37, 39.) Red charts are charts relating to tests conducted on behalf of employers who require their employees to take such tests, such as a mandatory physical exam or required drug test. (Defs.' 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) First Choice Medical contracts with employers to perform these tests, which are paid for by the employer rather than the patient; since they generate significant revenue for the practice, "there was an emphasis on the red charts." (Defs.' 56.1 ¶ 41–42; Pl.'s 56.1 ¶¶ 41–42.) Fontana reported that unnamed employees at the Riverhead office complained that March was not doing enough to clean up at the end of

the day; Fontana characterized this complaint as coming from someone who didn't want to do "extra work" and did not discipline March for this complaint. (Defs.' 56.1 ¶ 96; Pl.'s 56.1 ¶ 96.)

In late 2012, following the closure of the Riverhead office, Fontana became Office Manager of the Holbrook office. (Defs.' 56.1 ¶¶ 43–44; Pl.'s 56.1 ¶¶ 43–44.) Once the Riverhead office closed, the only office where x-rays were taken was the Holbrook office. (Defs.' 56.1 ¶ 50; Pl.'s 56.1 ¶ 50.) When the Riverhead location closed, Goldman considered letting March go, but Cohen and Fontana "approached him and asked him to maintain a job position for her, despite the fact that there were no x-rays at the Eastport office." (Defs.' 56.1 ¶ 51; Pl.'s 56.1 ¶ 51.) Additionally, though an x-ray technician usually earns more money than a floor manager, Cohen "pleaded with Dr. Goldman" to continue to pay March at the higher rate. (Defs.' 56.1 ¶¶ 52–53; Pl.'s 56.1 ¶¶ 52–53.) Goldman agreed to continue employing March at the same hourly rate she had earned as an x-ray technician, in part because March's husband "was not working at the time" and Goldman "felt that it was the right thing to do." (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.) The parties also note that another occasion, after March's husband had lost his job, Goldman offered to pay a higher portion of the employee contribution towards her health insurance. (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)

After the Riverhead location closed in late 2012, March was transferred to the Eastport office full-time, where she became the Floor Manager. (Defs.' 56.1 ¶ 45; Pl.'s 56.1 ¶ 45.) March had supervisory authority over all the medical assistants working at the Eastport office, and Cohen was her direct supervisor. (Defs.' 56.1 ¶¶ 46–47; Pl.'s 56.1 ¶¶ 46–47.) March's duties and responsibilities increased because the Eastport office was busier than the Riverhead office had been. (Defs.' 56.1 ¶ 48; Pl.'s 56.1 ¶ 48.) Goldman testified that March's initial

performance as Floor Manager at the Eastport office was "adequate." (Defs.' 56. 1 ¶ 56; Pl.'s 56.1 ¶ 56.)

March's Accident and Return to Work

On February 3, 2014, while exiting a pharmacy, March fell and hit her head on the curb, suffering a subarachnoid hemorrhage, whiplash, and concussion, and was hospitalized for between 5 and 7 days. (Defs.' 56.1 ¶¶ 57–59; Pl.'s 56.1 ¶¶ 57–59.) March filed for short-term disability and was away from work until March 21, 2014. (Defs.' 56.1 ¶ 60; Pl.'s 56.1 ¶ 60.) During her medical leave of absence, March saw a neurologist. (Defs.' 56.1 ¶ 61; Pl.'s 56.1 ¶ 61.) During March's seven-week medical leave of absence, her job responsibilities were distributed among the medical assistants at the Eastport office, and no individual was appointed to replace her as Floor Manager. (Defs.' 56.1 ¶¶ 63–64; Pl.'s 56.1 ¶¶ 63–64.)

March returned to work with no restrictions and did not make any requests for accommodation. (Defs.' 56.1 ¶ 62; Pl.'s 56.1 ¶ 62.) From March 2014 until July 2014, March felt that "everything was generally okay at work." (Defs.' 56.1 ¶ 68; Pl.'s 56.1 ¶ 68.) Defendants did not share her assessment; Goldman felt "that Plaintiff could not fulfill all of the duties require of a Floor Manager" and Cohen believed "that Plaintiff was not doing her job, including the contracts and the prior authorizations." (Defs.' 56.1 ¶¶ 69–70; Pl.'s 56.1 ¶¶ 69–70.) According to Cohen, other medical assistants in the office were "forced to complete Plaintiff's job duties that she was not performing." (Defs.' 56.1 ¶ 71.) Though March disputes this characterization, she agrees that she had "many responsibilities and she could not possibly do them all herself," so other medical assistants assisted her, "as was their job." (Pl.'s 56.1 ¶ 71.)

Kristine Knapp, who first began working as a medical assistant for First Choice in 2010, worked primarily in the Eastport office in 2014, under March's supervision.  (Defs.' 56.1 ¶ 72; Pl.'s 56.1 ¶ 72.)  March believed that Knapp was a reliable employee, "was familiar with how the place ran the floor," and "pretty much" knew how the office ran.  (Defs.' 56.1 ¶¶ 65–67; Pl.'s 56.1 ¶¶ 65–67.)  According to Knapp, after March returned from medical leave, March "no longer trained any new medical assistants and instead delegated nearly all of the training to" Knapp.  (Defs.' 56.1 ¶ 73.)  March denies this, stating that she was in fact training new medical assistants.  (Pl.'s 56.1 ¶ 73.)  Knapp also claims that March would take "inordinately long periods of time to triage patients, which caused delays in Plaintiff's ability to complete her other duties" and caused Knapp and other medical assistants to complete March's duties for her.  (Defs.' 56.1 ¶ 74.)  March disagrees, stating that the medical assistants "were not forced to take over her duties, except where those tasks were part of the medical assistants' duties."  (Pl.'s 56.1 ¶ 74.)

The parties agree that Knapp began to assume several of March's job responsibilities, such as completing authorizations, though they disagree about the circumstances.  (Defs.' 56.1 ¶¶ 135–136; Pl.'s 56.1 ¶¶ 135–136.)  Defendants assert that Knapp assumed these tasks because March "stopped doing her job" and was provided access to Cohen's desk and computer in order to perform these additional duties.  (Defs.' 56.1 ¶¶ 136–138.)  March believes that Knapp was assigned these additional tasks because Cohen intended to fire her and replace her with Knapp, and that Cohen gave Knapp the computer as "preferential treatment."  (Pl.'s 56.1 ¶¶ 136–139.)

The parties agree that March began to fall behind on the administrative work associated with the red charts.  (Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75.)  Defendants assert that March "began to

often fall very behind" and that "there could be anywhere from 10 to 30 red charts per week that needed to be followed up on." (Defs.' 56.1 ¶ 75.) March states that she would get "slightly behind" but "not to the extent described by" defendants. (Pl.'s 56.1 ¶ 75.) The parties also agree that the medical assistants assisted March with callbacks, though they disagree on the specifics. March asserts that "due to the volume of call backs [*sic*], the medical assistants would help with the callbacks, unless they did not feel comfortable doing so, and March would handle those specific callbacks." (Pl.'s 56.1 ¶ 76.) She also asserts that it was "virtually impossible for one person to do all of the callbacks and the callbacks would pile up on days when March was not in the office." (Pl.'s 56.1 ¶ 92.) Defendants state that March "frequently" failed to complete callbacks to employers regarding employee test results in a timely fashion, which required medical assistants to complete the belated callbacks on her behalf and jeopardized First Choice's red chart contracts with employers. (Defs.' 56.1 ¶ 76.) Defendants assert that March has acknowledged that "there were days in which callbacks were not being done, and that she was responsible for ensure [*sic*] that callbacks were completed." (Defs.' 56.1 ¶ 92.)

Defendants also assert that March would "often sit in the medical lab for long periods of time and not want to leave to help the other medical assistants, which resulted in the medical assistants having to do extra work to make up for her shortcomings." (Defs.' 56.1 ¶ 77.) March states that she did not stay in the lab for long periods of time "unless she was actually doing work there." (Pl.'s 56.1 ¶ 77.) Knapp and other medical assistants "often" complained to Cohen and Goldman that March was failing to perform her job duties and that they felt that her work was "being dumped on them." (Defs.' 56.1 ¶ 94; Pl.'s 56.1 ¶ 94.)

Desmond Delgado is a medical assistant who worked at the Eastport office in 2014, under March's supervision. (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78.) March felt that Delgado was a

"terrific worker."  (Defs.' 56.1 ¶ 84; Pl.'s 56.1 ¶ 84.)  In June 2014, Delgado complained to Cohen about March's "lack of supervision and leadership."  (Defs.' 56.1 ¶ 93; Pl.'s 56.1 ¶ 93.) Delgado believed that March was extremely unapproachable.  (Defs.'s 56.1 ¶ 80; Pl.'s 56.1 ¶ 80.)  Delgado states that in June 2014, when Cohen was on vacation, March "sat in the lab for the bulk of each day simply ignoring duties and responsibilities," and when Delgado went into the lab, he "often … noticed blood samples piling up behind Plaintiff, waiting to be centrifuged." (Defs.' 56.1 ¶¶ 81–82.)  March disputes that she ignored her duties as a Floor Manager or that she left blood samples "laying around, waiting to be centrifuged."  (Pl.'s 56.1 ¶¶ 81–82.) Delgado also claimed that March "would never train new medical assistants," (Defs.' 56.1 ¶ 83), though March asserts that she trained and helped "as many fellow employees as time allowed, and she was willing to help others," (Pl.'s 56.1 ¶ 83).  Delgado stated that he resigned in July 2014 because he felt like he was "getting no support from his manager" and "a lot of her duties and responsibilities were falling on him."  (Defs.' 56.1 ¶ 79.)  March states that this is not true and Delgado left to take a higher paying job with another medical facility.  (Pl.'s 56.1 ¶ 79.)

Amanda DiLorenzo is a biller who worked with March at the Riverhead office and the Eastport office.  (Defs.' 56.1 ¶ 86; Pl.'s 56.1 ¶ 86.)  When March returned from her medical leave, DiLorenzo thought that March appeared "to be on an extremely short fuse."  (Defs.' 56.1 ¶ 87; Pl.'s 56.1 ¶ 87.)  DiLorenzo stated that March appeared flustered and annoyed when she was asked to answer the phone or handle multiple duties at the same time and would often leave patients on hold for prolonged periods of time.  (Defs.' 56.1 ¶¶ 88–89; Pl's 56.1 ¶¶ 88–89.) Donna Spaeth, a biller who works in the Eastport office, also stated that March was reluctant to talk to patients on the phone and would often leave patients on hold for long periods.  (Defs.' 56.1 ¶ 91; Pl.'s 56.1 ¶ 91.)  Spaeth complained to Cohen that March would rarely come out of

the medical lab to talk to patients who were at the front desk.  (Defs.' 56.1 ¶ 95; Pl.'s 56.1 ¶ 95.)

Cohen had to hold a meeting between Spaeth and March in order to "resolve the issue."  (Defs.'

56.1 ¶ 95; Pl.'s 56.1 ¶ 95.)

Cohen held meetings with March following the complaints by Delgado, Knapp, Spaeth,

and others.  (Defs.' 56.1 ¶ 134; Pl.'s 56.1 ¶ 134.)   However, the parties agree that March was not

aware that other medical assistants were complaining about her performance and did not believe

that her performance was slipping.  (Defs.' 56.1 ¶¶ 127–128; Pl.'s 56.1 ¶¶ 127–128.)  Rather,

March felt that Cohen began "micromanaging" her in June 2014 and dismissing her suggestions

or ideas for how to make the floor run more smoothly.  (Defs.' 56.1 ¶ 130; Pl.'s 56.1 ¶ 130.)

March believes that Cohen "probably eliminated a lot of people that won't follow what she

wants to a T."  (Defs.' 56.1 ¶ 131; Pl.'s 56.1 ¶ 131.)

In 2014, Cohen and Fontana would frequently speak to each other about office matters,

including personnel.  (Defs.' 56.1 ¶ 97; Pl.'s 56.1 ¶ 97.)  In 2014, Cohen told Fontana that

someone at the Eastport office had complained that March was not doing her job and did not do

her work quickly enough.  (Defs.' 56.1 ¶ 98; Pl.'s 56.1 ¶ 98.)  At some point prior to October

2014, Cohen expressed that she was unhappy with the way that things were running on the floor

at the Eastport office, and specifically complained that March did not know how to multitask.

(Defs.' 56.1 ¶ 104; Pl.'s 56.1 ¶ 104.)  Cohen had several conversations with March in 2014 about

March's performance issues.  (Defs.' 56.1 ¶ 105; Pl.'s 56.1 ¶ 105.)  Cohen states that she knew

that March was coming back from an injury and tried to give her as much time as possible to

adjust to returning to work.  (Defs.' 56.1 ¶ 106; Pl.'s 56.1 ¶ 106.)  On one occasion, Cohen asked

March if she was "okay" because March was not performing "as she normally did" following her

return from medical leave and stated that she was "concerned as a friend."  (Defs.' 56.1 ¶ 107;

Pl.'s 56.1 ¶ 107.) Cohen knew that the Eastport office was busy and thought it was possible that March was simply overwhelmed. (Defs.' 56.1 ¶ 108; Pl.'s 56.1 108.) But, Cohen asserts, whenever she attempted to speak with March about her work performance, March would object, and appeared to take personal offense at the criticism. (Defs.' 56.1 ¶ 109; Pl.'s 56.1 ¶ 109.) March asserts that on multiple occasions, Cohen told March that she was old and that she should retire. (Pl.'s 56.1 ¶ 154, second ¶ 2–3.) March also states that she attempted to complain to Goldman about Cohen's comments, but he refused to speak with March without Cohen present. (Pl.'s 56.1 second ¶ 4.)

In the summer of 2014, Goldman received complaints from medical assistants regarding March not performing her job duties. (Defs.' 56.1 ¶¶ 99–100; Pl.'s 56.1 ¶¶ 99–100.) In addition, Goldman stated that he believed, following her return from her medical leave of absence, that March would "stay in the lab, complain[ing] of headaches, and was no longer supervising the staff." (Defs.' 56.1 ¶ 101; Pl.'s 56.1 ¶ 101.) Around this time, Goldman asked Cohen for her opinion, and Cohen told him that she had also noticed a significant decline in March's performance. (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.) Cohen also told Goldman that she had received complaints from medical assistants and staff members in the Eastport office. (Defs.' 56.1 ¶ 111; Pl.'s 56.1 ¶ 111.) Cohen told Goldman that she had tried to speak with March about her performance, but that those conversations were "unproductive." (Defs.' 56.1 ¶ 112; Pl.'s 56.1 ¶ 112.) Goldman asserts that he also tried to have conversations with March that would help her and encourage her to do her job and says that they spoke "all the time" about her performance. (Defs.' 56.1 ¶ 102.) March admits that she and Goldman had conversations about her job performance but disputes that these conversations occurred "all the time." (Pl.'s 56.1 ¶ 102.)

Termination of X-Rays in Holbrook Office

In August 2014, in addition to her role as Floor Manager, March was also working as an x-ray technician at the Holbrook office on Sundays. (Defs.' 56.1 ¶ 143; Pl.'s 56.1 ¶ 143.) Every x-ray technician is required to log all the x-rays she takes. (Defs.' 56.1 ¶ 144; Pl.'s 56.1 ¶ 144.) The x-ray log from 2014 showed a significant decline in the number of x-rays taken on Sundays in the Holbrook office, from an average of 2 x-rays per day in 2013 down to 1.3 x-rays per day in 2014, and a significant increase in the number of Sundays when no x-rays were performed at all. (Defs.' 56.1 ¶¶ 145–147; Pl.'s 56.1 ¶¶ 145–147.) In 2014, Goldman determined that the practice was losing money by having an x-ray technician working on Sundays and decided to discontinue x-rays on Sundays. (Defs.' 56.1 ¶¶ 148–150; Pl.'s 56.1 ¶¶ 148–150.) No one replaced March as the x-ray technician in Holbrook on Sundays. (Defs.' 56.1 ¶ 150; Pl.'s 56.1 ¶ 150.)

Fall 2014 Disciplinary Meetings

March asserts that at a meeting in September 2014, Cohen told March that she could not multitask, so March should either resign, give up her title as Floor Manager, or take a pay cut. (Pl.'s 56.1 second ¶ 9.)

In October 2014, March had a meeting with Goldman and Cohen. (Defs.' 56.1 ¶ 113; Pl.'s 56.1 ¶ 113.) At that meeting, Goldman told March that the floor at Eastport was not running efficiently, and not running the way it should. (Defs.' 56.1 ¶ 113; Pl.'s 56.1 ¶ 113.) Goldman advised March to "call up the Holbrook office," which was running more efficiently, to learn how the floor was run at that office. (Defs.' 56.1 ¶ 114; Pl.'s 56.1 ¶ 114.) At that meeting, Goldman told March that they would "give it a few weeks, and re-evaluate." (Defs.' 56.1 ¶ 115; Pl.'s 56.1 ¶ 115.) Goldman and Cohen were hopeful that following the October 2014 meeting,

March would understand that her job was at risk, and her work performance would improve. (Defs.' 56.1 ¶ 115; Pl.'s 56.1 ¶ 115.)

Following the October 2014 meeting, March's performance did not change. (Defs.' 56.1 ¶ 116; Pl.'s 56.1 ¶ 116.) However, Goldman did not terminate March's employment after two weeks because he was aware of March's financial needs at the time. (Defs.' 56.1 ¶ 116; Pl.'s 56.1 ¶ 116.) Then, on November 22, 2014, March suffered a fire in her home. (Defs.' 56.1 ¶ 117; Pl.'s 56.1 ¶ 117.) Cohen asked Goldman not to terminate March's employment during "that stressful time," and he agreed. (Defs.' 56.1 ¶ 117; Pl.'s 56.1 ¶ 117.) The Eastport office took up a collection for March, which Cohen organized. (Defs.' 56.1 ¶ 156; Pl.'s 56.1 ¶ 156.)

In December 2014, Goldman told March that she needed to do better or she would lose her job. (Defs.' 56.1 ¶ 118; Pl.'s 56.1 ¶ 118.) Cohen asked Goldman not to fire March in December 2014 because it was the holiday season, and he agreed to keep her on. (Defs.' 56.1 ¶ 119; Pl.'s 56.1 ¶ 119.) Dr. Goldman continued to employ March because he believed she was having a "hard time with her husband unemployed and a child in college," and keeping March employed "just seemed like the right thing to do." (Defs.' 56.1 ¶ 103; Pl.'s 56.1 ¶ 103.) Cohen also wanted March to remain in her job, even after Cohen believed that March could no longer perform all the required duties (Defs.' 56.1 ¶ 120; Pl.'s 56.1 ¶ 120.) March, however, felt that Cohen was "harassing" and "targeting" her in December 2014. (Defs.' 56.1 ¶ 157; Pl.'s 56.1 ¶ 157.)

Termination

In January 2015, defendants made the decision to fire March. (Defs.' 56.1 ¶ 121; Pl.'s 56.1 ¶ 121.) The parties dispute who precisely made the decision. Defendants assert that Goldman informed Cohen that he had made the decision to terminate March's employment and

Cohen "did not object," (Defs.' 56.1 ¶¶ 121–123, 125), though Goldman stated at his deposition that he was "sure" Cohen had input into the decision, (Exhibit 2 at 50). March, however, points to testimony from Cohen that "Brenda was not doing her job the way she had in the past and that's why I let her go" to suggest that it was actually Cohen who made the ultimate decision, perhaps in consultation with Goldman. (Pl.'s 56.1 ¶¶ 121–123, 125.) At the time of March's termination, Cohen was 45 years old and Goldman was 57 years old. (Defs.' 56.1 ¶¶ 161–162.) March was 65 years old. (Pl.'s 56.1 second ¶ 18, Defendants' Rule 56.1 Statement in Reply ("Defs.' Reply 56.1") (Doc. No. 75).)

It is undisputed that Goldman left it to Cohen to inform March that she had been fired. (Defs.' 56.1 ¶ 124; Pl.'s 56.1 ¶ 124.) Cohen asserts that she was very upset that she had to tell her friend she was fired and began to cry during the meeting. (Defs.' 56. 1 ¶ 124.) March disputes this account and says that she did not see Cohen cry. (Pl.'s 56.1 ¶ 124.)

<u>Knapp's Promotion to Floor Manager</u>

After March was fired, Goldman and Cohen jointly made the decision to promote Knapp to Floor Manager of the Eastport office. (Defs.' 56.1 ¶ 139; Pl.'s 56.1 ¶ 139.) Defendants assert that Knapp assumed this role in January 2016, after Knapp had shown "the most initiative." (Defs.' 56.1 ¶ 141.) March asserts that Knapp assumed this role as soon as she was fired, and certainly no later than August 2015. (Pl.'s 56.1 ¶ 139.) March testified that Cohen's friendship with Knapp played "a big role" in the decision to ultimately terminate March's employment. (Defs.' 56.1 ¶ 167; Pl.'s 56.1 ¶ 167.) Knapp was born in 1988 and was 27 years old at the time that March was fired. (Pl.'s 56.1 second ¶ 18; Defs.' Reply 56.1 ¶ 18.)

March admits that Goldman did not discriminate against her on the basis of age. (Defs.' 56.1 ¶ 126; Pl.'s 56.1 ¶ 126.) March believes that Cohen is the only individual who discriminated against her on the basis of her age. (Defs.' 56.1 ¶ 131; Pl.'s 56.1 ¶ 131.)

Evidence from Former Employees

To rebut defendants' assertion that March's performance was slipping, March presents accounts from several other coworkers. First, she supplies an affidavit from Pauline Schmidt, a registered nurse who worked at the Eastport office until April 2018. Schmidt states that March was a "wonderful professional" and that she did not have any complaints or criticisms of March's work, nor had she witnessed a decline or heard anyone complain about March's work. (Pl.'s 56.1 second ¶¶ 25–29; Defs.'s Reply 56.1 ¶¶ 25–29.)

Second, March puts forth an affidavit from Jennifer Sammis, who was employed at the Eastport office until May 2016, and who was also deposed. The Sammis affidavit states that Sammis "never had any issues with any of Brenda's work" and describes March as "professional, educated, [and] kind." (Affidavits in Opposition (Doc. No. 73-1) at 12.) The affidavit further states that March "completed all her duties in an efficient and timely manner whenever needed," and that Sammis heard Cohen and Knapp say that March was "too slow" and claim that "she was not bringing patients back to examination rooms as frequently as the medical assistants because of her age." (*Id.*) At her deposition, Sammis clarified that she could not remember exactly what Cohen had said about March's age, only the "nature of it," though she was confident that she had heard Knapp say three or four times that March was "too slow because of her age." (Exhibit 2 at 122–23.) Sammis also testified that Cohen had stated that she tried to schedule some of the more efficient medical assistants during March's shifts. (Excerpt from Sammis Dep. (Doc. No. 76-2) at 28.) Sammis stated in her affidavit that she believed that

Cohen gave March more work than the medical assistants and "her workload was increased by Cohen," (Affidavits in Opposition at 12), but clarified at her deposition that she did not observe Cohen increasing March's workload, (Excerpt from Sammis Dep. at 29). Sammis testified at her deposition that she saw no issues with March's work, (Pl.'s 56.1 second ¶ 31, 34), although she did admit that the Eastport office "fell behind" on callbacks and prior authorizations, both of which were March's responsibility, (Defs.' Reply 56.1 ¶ 35.4).

Finally, Sammis attests that she attended an "informal meeting" at Cohen's house in December 2014 along with Knapp and other employees. (Pl.'s 56.1 second ¶ 36.) At that meeting, Sammis witnessed Cohen and Knapp comment about the ages of March and another employee and state that they were frustrated with working with March. (*Id.*) Defendants assert that in December 2014, when Cohen was recovering from surgery, several of her coworkers went to her house to help her decorate for the holidays, and there was no discussion of work or of Cohen's age at that gathering. (Defs.' Reply 56.1 ¶ 33.1).) Defendants dispute that Cohen ever made these comments and provide ten paragraphs of facts regarding the circumstances of Sammis's departure from First Choice in order to attack Sammis's credibility. (Defs.' Reply 56.1 ¶¶ 31–32.10.)

Third, March provides an affidavit from Michele Devito, who worked at First Choice from 2012 until March 2015. (Pl.'s 56.1 second ¶ 37, Defs.' Reply 56.1 ¶ 37.) Devito also characterized March as a dedicated and reliable worker who was helpful to the medical assistants. (Pl.'s 56.1 ¶ 38.) Devito asserts that Cohen would "constantly criticize" March, "dump more work" on her, and told March that she was "old" and should retire. (Pl.'s 56.1 ¶ 39.) Defendants dispute this account and deny that Cohen dumped work on March. (Defs.' Reply 56.1 ¶ 39.)

<u>The Complaint</u>

On November 9, 2015, March filed a charge of discrimination on the basis of age with the New York State Division of Human Rights, cross-filed with the Equal Employment Opportunity Commission ("EEOC"). (Compl. (Doc. No. 1) ¶ 4.) The EEOC issued March a Right-to-Sue letter on April 20, 2017. (*Id.*; *see also* Complaint, Ex. A ("Right-to-Sue Letter") (Doc. No. 1) at 10.) March timely commenced this action on July 18, 2017, (*id.*), and filed an amended complaint ("AC") on July 25, 2017, (AC (Doc. No. 7)).

In her AC, March first brings age discrimination claims under the ADEA, NYSHRL, and SCHRL against First Choice Medical. (AC ¶¶ 24–25.) March also alleges that Cohen and Goldman violated N.Y. Exec. Law § 296(6) and Suffolk County Code § 528-12(A), when they "aided, abetted, incited, compelled, and/or coerced the aforementioned discriminatory conduct." (*Id.* ¶¶ 26–27.) For her loss of earnings, "great pain, mental anguish and physical injury," March seeks compensatory damages, "equitable relief, and any other damages and/or remedies permissible under law." (*Id.* ¶ 28.)

<u>The Instant Motion</u>

Defendants now move for summary judgment with respect to all claims, raising three principal arguments. First, defendants argue that March has failed to meet her burden to set forth a *prima facie* case of age discrimination because March has failed to show that her termination occurred under circumstances raising an inference of discrimination. (Def.'s Mem. (Doc. No. 71) at 11–14.) Specifically, defendants argue that because Goldman was the person who ultimately decided to terminate March's employment, and March admits that he did harbored no discriminatory animus towards her, March cannot raise an inference of discrimination. (*Id.* at 12–13.) Second, defendants argue that even if the Court finds that March did satisfy her burden

to make out a *prima facie* case, that defendants have proffered a legitimate, non-discriminatory reason for March's termination, namely her declining work performance and the multiple complaints about her performance from her coworkers, which she made no effort to address despite multiple conversations about her performance deficiencies. (*Id*. at 14–21.) Third, defendants argue that March has failed to put forth any facts that would demonstrate that this proffered reason was mere pretext, let alone to meet her ultimate burden to show that her age was the but-for cause of her termination. (*Id*. at 21–23.) Defendants reiterate that it was Goldman, not Cohen, who made the decision to fire March, and point out that Cohen herself was in a protected age group when March was fired, and that Cohen was the person who hired March when March was already in a protected age category. (*Id*. at 22–27.) Finally, defendants move for summary judgment on March's age discrimination claims brought under state law, arguing that those claims are analyzed under the same burden-shifting test as ADEA claims. (*Id*. at 11.)

In response, March first argues that she has set forth a *prima facie* case and Cohen's age-based comments are sufficient to raise an inference of discrimination on the basis of age. (Pl.'s Mem. (Doc. No. 74) at 15–18.) March disputes defendants' allegation that Cohen was not the one who terminated March and argues that Cohen's age and her friendship with March do not preclude her from having discriminated against March. (*Id*. at 24–27.) Second March cites at length from *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), to support her proposition that because First Choice's explanation is unpersuasive, she has sufficiently demonstrated pretext. (*Id*. at 20.) March asserts that she was replaced by Knapp, a younger person, which is circumstantial evidence that she was subject to age discrimination. (*Id*. at 18.) And, March argues that she has sufficiently shown pretext by demonstrating that defendants deviated from established procedures by firing her without giving her any written warning, a fact

that was noted in the New York State Division of Human Rights report. (*Id.* at 19.)  Further,

March argues that defendants' proffered explanation must be pretext for discrimination because

if she had truly been performing as terribly as they assert, they would not have retained her as an

employee for several months after her allegedly deficient performance began. (*Id.* at 19–21.)

March also raises questions about the credibility of the affiants upon whom defendants rely to

demonstrate that March's performance had declined. (*Id.* at 21–22.)  Third, March argues that

she has established that age was the but-for cause of her termination, stating:

> [T]he Second Circuit has allowed an employee to demonstrate the but-for
> causation in the same way as that employee demonstrates pretext.  For the sake of
> brevity, that argument will not be reiterated here, but this Honorable Court is
> respectively referred to Plaintiff's argument on pretext as a means of Plaintiff's
> demonstrating but-for causation.

(*Id.* at 23.)  Finally, March argues that defendants may not rely upon statistical analysis to

support their argument that First Choice did not discriminate against March, though defendants

did not provide any statistical analysis to the Court in connection to the instant motion. (*Id.* at

27–28.)

In reply, defendants first argue that March cannot meet her *prima facie* burden because it

was Goldman who made the decision to fire March, and she admitted that he harbored no

discriminatory animus against her. (*Id.* at 3–8.)  Defendants argue that Cohen did not make the

alleged discriminatory comments about March, and the witnesses who claim to have heard her

make discriminatory remarks are not credible; moreover, even if Cohen did make the alleged

discriminatory remarks, her comments did not affect Goldman's decision-making. (*Id.* at 5–8.)

Additionally, defendants argue that the dispute over Knapp's start date is "illusory" and Knapp

herself has testified, twice, that her promotion came approximately one year after March was

fired. (*Id.* at 8.)  Further, defendants state that the disciplinary policy to which March points in

order to demonstrate that defendants deviated from established procedure in firing her was, in fact, adopted after her termination. (*Id*. at 9.) Next, Defendants argue that they have presented legitimate, non-discriminatory reasons for March's termination, which she has failed to dispute, such as the multiple complaints Goldman and Cohen received about March's performance. (*Id*. at 10–11.) March disagreed with their critiques, but this is not sufficient to show pretext. (*Id*.) Finally, defendants argue that the report and determination of probable cause by the New York State Division of Human Rights is neither admissible nor probative, and further that they do not rely on the statistical evidence presented to that body in the instant motion. (*Id*. at 8, 11.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it may impact the "outcome of the suit under the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the

factual assertions . . . in the light most favorable to the party opposing the motion." (citations omitted)).

Once the moving party has demonstrated that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted) (citation omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (collecting cases and stating that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation"). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

The Court bears in mind that in discrimination cases "'smoking gun' evidence of discriminatory intent is rare and most often must be inferred." *Forsyth v. Fed'n Employment & Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)), *abrogated on other grounds*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007). Accordingly, the Second Circuit has "repeatedly emphasized 'the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.'" *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).

### DISCUSSION

The ADEA makes it unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "To establish a disparate-treatment claim under the plain language of the ADEA,

therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 176 (2009). In this way, the ADEA is materially different from other statutory discrimination claims, such as claims for discrimination based on race or sex, which allow plaintiffs to prevail where they can show that their membership in that protected class was simply a motivating factor in the adverse employment action. Though courts in this and other circuits have long referred to the three-step burden-shifting framework for assessing Title VII discrimination claims first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–05 (1973), the Supreme Court in *Gross* cautioned against adopting this framework for claims brought under the ADEA. *See Gross*, 557 U.S. at 174 ("This Court has never held that this burden-shifting framework applies to ADEA claims. And, we decline to do so now."); *see also Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008) (advising that employees and their counsel bringing an ADEA claim "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.")

The Second Circuit has found that the *McDonnell Douglas* test continues to apply in ADEA cases, with the caveat that the key inquiry at the third step of the analysis is whether plaintiff has shown, by a preponderance of the evidence, that her age was the but-for cause of the challenged adverse employment action. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (finding that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit," but "*Gross* changes the latter part of this formulation by eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases.")

The *McDonnell Douglas* test, as applied in *Gorzynski*, is as follows. At the first step, the Court looks to plaintiff to establish a *prima facie* case of age discrimination. This initial burden, which is "not a heavy one," is met where the plaintiff sets for sufficient evidence to show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107. At the second step, the burden shifts to the defendant to proffer "'some legitimate, nondiscriminatory reason' for its action." *Id.* at 106 (quoting *McDonnell Douglas*, 411 U.S. at 802). If defendant can do so, the burden shifts back to plaintiff to demonstrate that this proffered explanation was mere pretext *and* that her age was "not just a contributing or motivating factor" in the adverse employment action she suffered, but the but-for cause. *Id.*

## I.      Prima Facie Case

The parties do not dispute that March has satisfied her burden with respect to the first three prongs of her *prima facie* case. Accordingly, the inquiry here is limited to whether March has present evidence sufficient to give rise to an inference of discrimination.

Remarks from a supervisor may be sufficient to raise an inference of discriminatory intent where those remarks were more than stray. Put another way, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007). Discriminatory statements are suggestive of animus where they are said by someone "who had enormous influence in the decision-making process," *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001), or were said close in time to the adverse employment action, *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 162–63 (2d Cir. 1998).

Defendants argue that Goldman made the ultimate decision regarding whether to fire March, and therefore Cohen's remarks are not probative of discrimination. However, there is no genuine dispute that Cohen had great influence over the decision to fire March. The undisputed evidence shows that Cohen successfully persuaded Goldman to refrain from terminating March's employment on at least two occasions, and Goldman also testified that he was sure that Cohen had input into the decision; further, Cohen had the authority to hire and fire employees, and it was Cohen who informed March that her employment had been terminated. Accordingly, there is no genuine dispute as to whether Cohen had significant influence over the decision to terminate March.

Defendants also argue that the Court should disregard the evidence March puts forth to show that Cohen said that March was "old" and "should retire," including alleged criticisms of March's age during an event at Cohen's house in December 2014, because the witnesses who claim to have heard these comments are not credible. The Court cannot properly make credibility determinations on a summary judgment motion and must construe the facts and resolve all ambiguities in favor of the nonmovant, whose evidence "is to be believed." *Anderson*, 477 U.S. at 255. The record includes affidavits from Devito, March, and Sammis stating that Cohen made negative comments about March's age, specifically calling her "old," on multiple occasions, although these affidavits are not clear about precisely when or how often this occurred. Sammis's deposition testimony and affidavit both state that Cohen mentioned March's age when complaining about her at an event in Cohen's home in December 2014, just one month before March was fired. Drawing all reasonable inferences in favor of March, the alleged discriminatory comments, made by someone with influence over the decision to fire March and close in time to March's termination, raise an inference of discrimination sufficient to make out

the fourth element of a *prima facie* case. Accordingly, the Court will proceed to step two of the *McDonnell Douglas* test.

## II. Legitimate, Non-Discriminatory Rationale

At step two of the *McDonnell Douglas* burden-shifting framework, the defendant bears "the burden of producing an explanation to rebut the prima facie case .... The purpose of the McDonnell Douglas framework is to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335 (2d Cir. 1997).

Defendants assert that March was terminated from her employment because of her poor work performance. Though March disputes that her work performance had declined, "[t]o be a valid legitimate, non-discriminatory reason for termination, an employer's belief need not be correct, only honestly held." *Shah v. Eclipsys Corp.*, No. 08-CV-2528 (JFB) (WDW), 2010 U.S. Dist. LEXIS 67700, at *32 (E.D.N.Y. July 7, 2010). In other words, "when considering the legitimacy of an employer's reason for an employment action, we look to what motivated the employer rather than to the truth of the allegations against [the] plaintiff on which it relies." *Vasquez v. Empress Ambulance Serv.*, 835 F.3d 267, 275 (2d Cir. 2016) (internal quotation marks and citations omitted).

Here, defendants have put forth sufficient evidence in the record to show that they had a legitimate, non-discriminatory reason for terminating March, namely her declining performance in 2014 and failure to remedy that decline after multiple conversations with her supervisors. The parties agree that March fell behind on her red chart duties, (Pl.'s 56.1 ¶ 75; Defs.' 56.1 ¶ 75), and that medical assistants had begun taking on callbacks that March did not complete, (Defs.'

56.1 ¶¶ 76, 92; Pl.'s 56.1 ¶¶ 76, 92).  The undisputed record demonstrates that Goldman and Cohen received complaints from at least four employees about March's work performance in 2014, including that they were taking on March's duties because she was failing to complete them.  Knapp stated that she frequently complained to Cohen about having to take on more work.  The parties also do not dispute that Knapp began performing March's authorization duties in mid-2014.  Further, the record demonstrates that Cohen and Goldman both observed problems with March's work, and both discussed her work performance with her on multiple occasions, including the October 2014 meeting between March, Cohen, and Goldman in which Goldman told March that the floor at Eastport was not running efficiently and said they would revisit the issue in a few weeks.  This evidence is sufficient to meet defendants' burden at step two of the *McDonnell Douglas* burden-shifting test.

### III.       But-For Cause

"If the employer articulates a non-discriminatory reason for its employment decision, the presumption of discrimination raised by the prima facie case 'simply drops out of the picture.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134-35 (2d Cir. 2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993)).  At step three, then, the plaintiff bears the burden of setting forth facts "that would allow a rational factfinder to conclude that the proffered reason was not the true reason for the adverse employment action, and that age was." *Id.* at 135.

The comments Cohen made about how March was "old" and "should retire" are inappropriate but not sufficient to survive summary judgment.  The ADEA disallows the mixed-motive claims that are permissible under other anti-discrimination statutes.  "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action and

not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (internal quotation marks and citations omitted). March cannot clear this high bar. Viewing the record as a whole, no reasonable jury could find that age was the but-for cause of March's termination. March avers that defendants' proffered explanation, namely that her work performance was slipping, was not true; to support this argument, she provides declarations from several former coworkers who provided glowing reviews of her performance. Under the law, however, "it is the perception of the decision-maker, and not that of plaintiff, which is relevant." *Rosen v. Columbia Univ.*, No. 92-CV-6330 (AGS), 1995 WL 464991, at *7 (S.D.N.Y. Aug. 7, 1995), *aff'd sub nom. Rosen v. Feldman*, 101 F.3d 108 (2d Cir. 1996) (quoting *Carlton v. Interfaith Medical Ctr.*, 612 F. Supp. 118, 122 (E.D.N.Y. 1985)). And though March is correct that "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive," *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147, (2000), it is not enough to argue that defendants' criticisms of her job performance were pretextual simply because she disagreed with them or because some of her coworkers believed she was an excellent worker. At this stage in the analysis, the Court will not "delve into the question of which portrayal is the correct one [because this Court] does not sit as a super-personnel department that reexamines an entity's business decisions." *Rosen*, 1995 WL 464991 at *7. The undisputed record demonstrates that multiple employees were unhappy with March's work performance, and that Goldman and Cohen received complaints during the summer of 2014. Additionally, March admits that both Cohen and Goldman advised her that they were not happy with how the floor was run in the Eastport office, but that she interpreted these critiques as unfair criticism and micromanagement because she did not believe that the Eastport office was running inefficiently.

The undisputed record also shows that March had fallen behind on her red chart and callback duties. No reasonable jury, when presented with the record evidence in this case, would conclude that March's performance issues were mere pretext and that her age was the but-for cause of her termination.

March next asserts that defendants deviated from established procedures in terminating her without a written warning, suggesting that the reason for her termination was pretextual.[2] In certain circumstances, procedural irregularities may form a basis to infer discriminatory animus or pretext. *See Stern v. Trustees of Columbia Univ. in the City of N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997). However, the mere fact of a deviation from established procedure is not sufficient to show animus or pretext where the record is devoid of evidence that the procedural departure was related to the plaintiff's membership in a protected class. *See Desir v. Bd. of Coop. Educ. Servs. (BOCES)*, 803 F. Supp. 2d 168, 177 (E.D.N.Y. 2011), *aff'd*, 469 F. App'x 66 (2d Cir. 2012) (summary order). March points to Cohen's testimony that an employee at First Choice is to be given two verbal warnings and then one written warning prior to termination to argue that defendants deviated from established procedure when they fired her without first providing a written warning. In a subsequent affidavit, Cohen avers that this testimony addressed a disciplinary process that had been adopted after March's termination. However, even if this

---

[2] In making this argument, March cites to findings in the New York State Division of Human Rights report, specifically that the finding of probable cause was based in part of defendants' failure to keep written disciplinary records. (*See* Pl.'s Mem. at 8–9, 20–22.) March argues that because courts can take judicial notice of such reports when considering a motion to dismiss, it "follows logically" that courts can consider the contents of those reports on summary judgment. (*Id.* at 21.) The Second Circuit has concluded that "a finding of probable cause by an administrative agency, … though not determinative, is admissible to help establish [a] prima facie case." *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985). However, the fact that defendants did not provide March with a written warning or keep written disciplinary records is not disputed by the parties. Accordingly, "the NYSDHR Determination itself is of little probative value" aside from suggesting that this Court should reach the same conclusion as the NYSDHR, and so the Court need not consider it. *Dollman v. Mast Indus.*, 2011 U.S. Dist. LEXIS 99802, at *3 (S.D.N.Y. Sep. 6, 2011); *see also Paolitto v. John Brown E &C., Inc.*, 151 F.3d 60, 66 (2d Cir. 1998) (finding that whether to exclude a Human Rights determination at trial was within the discretion of the district court).

disciplinary policy was in effect, March fails to explain how deviation from this policy shows that she was in fact terminated because of her age.  The undisputed record includes at least three meetings between Cohen and March in mid-2014 to address employee complaints, multiple conversations between Goldman and March about her performance during the summer of 2014, and meetings between Cohen, Goldman, and March in both October and December 2014 where March was warned that her performance was putting her job at risk.  These numerous meetings far exceed the two verbal warnings Cohen described as First Choice policy.  Additionally, the undisputed record shows that Cohen and Goldman chose not to promptly terminate March after the October 2014 meeting because they were sympathetic to her financial position and because she suffered a house fire in November 2014.  Cohen and Goldman instead had one more conversation with March about her job performance, and then decided not to fire her during the holiday season.  There is no evidence in the record that these decisions had anything to do with March's age.  No reasonable jury could conclude that the multiple additional verbal warnings March received in lieu of a written notice are in any way connected to age-based animus or demonstrate pretext.

March also argues that she was replaced by someone significantly younger than her when Knapp was promoted to Floor Manager of the Eastport office, thus demonstrating that defendants' explanation for her firing was pretextual.  While the Second Circuit has recognized that "replacement by a significantly younger employee can give rise to an inference of discrimination," *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000), they have also stated that "a disparity in the ages of a[] . . . plaintiff and her replacement . . . will not, by itself, always suffice" to show an employer's proffered reason is a pretext for discrimination, *Banks v. Travelers Cos.*, 180 F.3d 358, 367 (2d Cir. 1999).  Specifically, where a defendant

presents evidence sufficient to show that the plaintiff was terminated for poor performance, the mere fact that her qualified replacement was significantly younger is not sufficient to show that poor performance was a pretextual explanation for her firing. *See McGuire-Welch v. House of the Good Shepherd's Tilton Sch.*, 720 F. App'x 58, 61 (2d Cir. 2018) (summary order). The parties dispute whether Knapp was promoted immediately after, some months after, or a year after March's departure from First Choice, but there is no dispute that Knapp, at 27, was significantly younger than March at the time of March's termination. However, the fact that Knapp was younger than March does not provide a basis upon which a reasonable jury could conclude that defendants' explanation for March's termination was mere pretext. The undisputed record demonstrates that March's performance declined from her return to work in 2014 until her termination at 2015. And, assuming that Knapp did replace March, the undisputed record shows that Knapp was qualified for the position, having taken on portions of March's responsibilities for almost a year prior to March's termination; indeed, March testified at her deposition that Knapp was a reliable employee who "pretty much" knew how to run the office. Accordingly, Knapp's age is also not sufficient to show that defendants' proffered explanation was pretextual.

## ORDER TO SHOW CAUSE

"When district courts dismiss all claims independently qualifying for the exercise of federal jurisdiction, they ordinarily dismiss as well all related state claims." *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 597–98 (2018) (citing 28 U.S.C. § 1367(c)). Though the Court is inclined to decline to exercise supplemental jurisdiction over the remaining state law claims, neither party has briefed the issue, and the Second Circuit has held that a district court cannot *sua sponte* decline to exercise supplemental jurisdiction without first affording the parties notice or

any opportunity to be heard. *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018). Accordingly, the parties are directed to show cause in writing, within thirty days of the issuance of this Memorandum and Order, why the Court should exercise supplemental jurisdiction over March's remaining causes of action, brought under the NYSHRL and SCHRL. If none of the parties show cause within thirty days, the Court shall dismiss the remaining state-law claims without prejudice and direct the Clerk of Court to enter judgment in favor of defendants and to close this case.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to the first cause of action under the ADEA. The parties are directed to show cause in a writing filed within thirty (30) days of the issuance of this Memorandum and Order why the Court should exercise supplemental jurisdiction over March's remaining causes of action. If none of the parties show cause within thirty days, the Court shall dismiss the remaining state law claims without prejudice and direct the Clerk of Court to enter judgment in favor of defendants and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      July 15, 2021

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge

31